**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

EDWIN LAMAR MARTIN,

                 Petitioner,

v.

BRIAN CATES, Warden,

                 Respondent.

Case No.:  3:22-cv-1563-CAB-DDL

**ORDER: (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND**

**(2) DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Before the Court is a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed by Edwin Lamar Martin, ("Martin" or "Petitioner"), a state prisoner proceeding pro se.  [ECF No. 1.]  In his Petition, Martin challenges his San Diego Superior Court conviction in case number SCN383129.  [*See id.* at 1.[1]]  The Court has reviewed the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of

---

[1]  Page numbers for the Petition, Answer, Memorandum of Points and Authorities in Support of the Answer cited in this Order refer to those imprinted by the court's electronic case filing system.

the Answer [ECF Nos. 31, 31-1], the lodgments [ECF No. 32, *et seq*.], Petitioner's Reply [ECF No. 33] and all the supporting documents submitted by both parties. For the reasons discussed below, the Court denies the Petition and denies a certificate of appealability.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992). The California Court of Appeal summarized the facts as follows:

Prosecution Case

<u>G.M.</u>

On December 20, 2017, 16-year-old G.M. was spending the day in a park in Escondido after having run away from home the night before. Martin approached her and asked if she wanted to smoke marijuana. G.M. initially declined, but eventually accepted the invitation. Although they had planned to smoke the marijuana in the back of the park, Martin instead led G.M. to his car and drove her to his apartment complex.

G.M. "had a . . . bad feeling," but followed Martin into his apartment and bedroom, where he gave her a pipe with a packed bowl of marijuana. G.M. sat on the edge of Martin's bed smoking the marijuana while he went to the bathroom. Martin returned to the bedroom naked, so G.M. stood up. Martin put his hands on G.M.'s shoulders and pushed her onto his bed with "a lot" of force. He pulled down her pants and inserted his penis into her vagina. G.M. told Martin "no" several times, "tried to get up," and "tried to force him off" of her, but she could not "get out from under him." Martin ejaculated inside of G.M. and told her "it was his fantasy" to impregnate her.

Martin eventually took G.M. back to the park. About one week later, G.M. disclosed the rape to a counselor, and then to police.

G.M. testified she did not know either of Martin's other victims in this case.

Tracy

Tracy met Martin sometime in 2017 while she was living on the streets in Escondido. In November 2017, she consensually orally copulated him at his apartment.

On the night of January 9, 2018 (about three weeks after Martin raped G.M.), Martin offered Tracy $50 to clean his apartment because his mother, with whom he lived, was sick. Tracy accepted, but told Martin she "was just going to clean"—she "wasn't going to do anything else" because their prior sexual encounter, though consensual, "wasn't a pleasant experience."

Martin let Tracy shower at his apartment before cleaning. When she got out of the shower, he handed her a towel, "rough[ly]" took her by the arm, put his hand over her mouth, and brought her to his bedroom. Tracy, who is 4'11", did not resist because she has "an extensive history of sexual abuse" and knew that if she resisted she would "get hurt."

Once inside Martin's bedroom, he shut the door and "barricaded it with some type of metal pole" so Tracy could not open it. Martin helped Tracy onto his bed, used one hand to hold her legs over her head in a "painful" position, used his other hand to cover her mouth, and inserted his penis into her vagina. Although Tracy "didn't say no," she "resisted, but didn't pull away." She testified "it felt like . . . rape."

After about 10 or 15 minutes, Martin took his hand off Tracy's mouth, "pulled [her] hair really tight," "pushed [her] head down to his penis," and forced it into her mouth. Martin ejaculated in Tracy's mouth and forced her to swallow.

Martin dropped off Tracy at a park the next morning. She initially told a park ranger she had been "assaulted" and "victimized," but did not "go into detail." A few weeks later, Tracy reported the assault to police.

Tracy testified she did not know G.M., and was only a "casual acquaintance[ ]" of Martin's other victim in this case (Norma), who had earlier introduced Tracy to Martin.

Norma [footnote omitted]

Norma, a 38-year-old homeless woman, had an extensive history of drug use and dealing with Martin. [Footnote 2: Norma testified against Martin under a

grant of immunity pertaining to her testimony about her drug conduct.] In the late hours of January 12 or early morning hours of January 13, 2018 (a few days after Martin sexually assaulted Tracy), Martin asked Norma if she wanted to smoke a "blunt" with him. She said yes. They planned to buy rolling papers at a convenience store, but Martin instead drove Norma to his apartment.

When Norma was hesitant to enter Martin's apartment, he reassured her he was "not a weirdo" and was "not going to do anything to [her]." Although it "didn't feel right" in her "gut," Norma went with Martin into his apartment through the back gate. Martin locked the gate and backdoor behind them. Norma sat on a chair in Martin's bedroom, and he locked the bedroom door with a pole "that straddled the doorknob and went into the ground." Norma thought, "Oh, shit"—she "was in some kind of trouble" because there were "[t]oo many locks."

Martin seemed angry that Norma had been with other men but not him. His demeanor became aggressive, and he showed her several weapons that he had stored in his closet. [Footnote 3 omitted.] Martin handed Norma some crystal meth and snorted a line. Norma pretended to inject hers intravenously, but really injected it into a cigarette filter. Martin kept asking her, "'How are you feeling?'" He pulled down his shorts and began masturbating.

Norma told Martin she wanted to leave, but he responded, "You are not fucking going [any]where till you suck my dick." He grabbed her by the head, started shaking it, and "cuss[ed]" at her. Norma was scared and cried. Martin "got more aggressive" and told Norma "to be quiet" because "his mother was in the next room." Norma pleaded with him to let her leave.

Martin called Norma an "[u]ngrateful bitch" for not giving him sexual favors after he gave her drugs. Martin fought and "tussle[d]" with Norma for several hours to keep her from leaving. He pushed her, grabbed her, threw her, pulled her hair, and hit her. He "socked" her so hard he left knots on her legs, and he threatened to kill her and "take [her] sight" from her one good eye. Whenever Norma thought about exiting through the door or a window, Martin blocked her. He threatened to kill Norma, to "beat [her] ass," and that he would "not let [her] go until [she] sucked his dick."

Martin tried to unbutton Norma's pants, but she resisted and told him "[he] might as well kill [her]." Martin then forced his penis into Norma's mouth, and she orally copulated him so "that he would let [her] go." Martin pushed

on the back of Norma's head and pulled her hair until he ejaculated or preejaculated in her mouth.

A few minutes later, Martin reinserted his penis into Norma's mouth and ejaculated again. He then used his penis to aggressively rub ejaculate on Norma's face.

Norma asked Martin if she could leave, and he escorted her to his car to drop her off somewhere. When he dropped her off, he did not bring his car to a complete stop before pushing her out.

The next day, Norma—who was usually "uncooperative" with law enforcement—reported the sexual assault to police officers she approached in a parking lot.

Norma testified she did not know G.M., and knew Tracy only to the extent of exchanging pleasantries.

Defense Evidence

Martin acknowledged he had had sexual encounters with G.M., Tracy, and Norma, but he maintained they were all consensual. He believed the women were falsely accusing him because they were "jealous and env[ious] because [he] [had] things." He also believed the police were conspiring against him.

Martin's mother testified that her bedroom and Martin's bedroom share a wall, and she did not hear any commotion coming from his room the night Norma claimed they had fought for hours.

Prosecution Rebuttal Evidence

The detective who investigated Martin's case testified about her post-arrest interview of Martin. Portions of the recorded interview that impeached Martin's trial testimony were played for the jury.

The following statement by Martin during the interview was also played for the jury: "[I]t's pissing me off, that you['re] going to bring some raggedy fucking bitches, drug-fiend prostitute ass bitches and believe what the fuck they say, when they sucked a million dicks a fucking day."

[ECF No. 32-14 at 2–7]; *People v. Martin*, No. D077515 (Cal. Ct. App. 2021).

## III.  PROCEDURAL BACKGROUND

### A.  State Court Proceedings

On February 16, 2018, Martin was charged with six offenses arising from the sexual assault of three victims: two counts of forcible rape (Cal. Penal Code § 261(a)(2)) (counts 1 and 2); three counts of forcible oral copulation (Cal. Penal Code § 288a(c)(2)(A))[2] (counts 3–5); and one count of false imprisonment by violence (Cal. Penal Code §§ 236, 237(a)) (count 6).  [*See* ECF No. 32-1 at 9–12.]  Each offense also carried a multiple-victim enhancement allegation (Cal. Penal Code § 667.61(b), (c), (e)).  [ECF No. 32-1 at 9–10.]

On November 20, 2019, a jury found Martin guilty on all counts and found all enhancements to be true. *Id.* at 147–152. On March 9, 2020, the trial court sentenced Martin to 45 years-to-life, plus three years in prison.  [ECF No. 32-2 at 99–100.]

Martin appealed his conviction to the California Court of Appeal.  [*See* ECF No. 32-12.]  He claimed the trial court erred when it denied his motion for a mistrial after a prosecution witness testified to material that had been excluded during motions in limine. *See id*. He also raised claims related to sentencing errors.  *Id.*  On April 29, 2021, the appellate court denied relief on Martin's claim regarding denial of his mistrial motion and affirmed his conviction, but found the trial court had improperly failed to stay Martin's sentence on count six and directed he be resentenced to 45 years-to-life in prison.  **[***See* ECF No. 32-14 at 21.]

On May 28, 2021, Martin filed a petition for review in the California Supreme Court, again alleging the trial court erred in denying his motion for new trial based on improper testimony.  [*See* ECF No. 32–15.] The court denied the petition without comment or citation on July 17, 2021.  [ECF No. 32–16.]

### B.  Federal Court Proceedings

Martin filed the instant federal petition for writ of habeas corpus on October 11,

---

[2] The California Penal Code was later amended and former § 288a(c)(2)(A) is now California Penal Code § 287.

2022, raising three claims: (1) his conviction was the result of a fundamental miscarriage of justice, (2) he received ineffective assistance of counsel, in violation of his Sixth Amendment rights and (3) the trial court erred in denying his motion for mistrial based on improper witness testimony, in violation of his right to due process. [*See generally*, ECF No. 1.]

On January 17, 2023, the Court stayed the proceedings so that Martin could complete exhaustion of his state court remedies as to claims one and two. [*See* ECF No. 7.]

The stay was lifted on October 29, 2024. [ECF No. 26.] After an extension of time, Respondent filed an Answer on January 7, 2025. [ECF No. 31.] Martin filed a Reply on February 14, 2025. [ECF No. 33.]

## IV.   SCOPE OF REVIEW

Martin's Petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a

case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538

U.S. at 72.

## VI.    DISCUSSION

As noted above, Martin raises three claims in his Petition: (1) his conviction amounted to a fundamental miscarriage of justice, (2) his due process rights were violated when the trial court denied his request for a mistrial after improper witness testimony, and (3) his Sixth Amendment rights were violated by the ineffective assistance of defense counsel.  [*See generally*, ECF No. 1.]

### A.    Fundamental Miscarriage of Justice

In his first claim, Martin argues that "a fundamental miscarriage of justice occurred in [his] case as a result of [the proceedings in state court]."  [ECF No. 1 at 23–24.]

Martin raised this claim in a petition for habeas corpus filed with the California Supreme Court.  [ECF No. 32-21 at 25–37.]  The court denied the petition without comment or citation.  [ECF No. 32-22.]  Martin also raised the claim in his habeas petitions before the San Diego Superior Court and the California Court of Appeals.  [*See* ECF Nos. 32-17, 32-19.]  Both petitions were denied via reasoned decisions, but neither the trial court nor the appellate court addressed this specific claim.  [*See* ECF Nos. 32-18, 32-20.] Because no state court "furnish[ed] a basis" for its denial, this Court must conduct an "independent review of the record" to determine whether the state court's ultimate decision to deny the claim was "objectively unreasonable."  *See Murray v. Schriro*, 745 F.3d 984, 996–97 (9th Cir. 2014); *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013).

Here, Martin's claim fails because there is no clearly established federal law creating a stand-alone due process claim based on a "fundamental miscarriage of justice."  As a general matter, a "fundamental miscarriage of justice" in the habeas context refers to an "exception [that] allows federal courts to excuse procedural default in the 'truly deserving' habeas petition where there is a showing of actual innocence."  *Gage v. Chappell*, 793 F.3d 1159, 1167 (9th Cir. 2015) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).  The exception "provides a gateway past the procedural requirements imposed by AEDPA," which might otherwise bar federal courts from

"consider[ing] the merits of certain procedurally defaulted habeas petitions asserting constitutional violations." *Id*. at 1166–67.

In *Schulp*, the Supreme Court stated that a claim of "actual innocence" brings a petition within a "narrow class of cases implicating a fundamental miscarriage of justice." *Schlup*, 513 U.S. at 314–15 (cleaned up).  By falling within this narrow class of cases, petitioners can obtain review of constitutional claims despite procedural default. *Id*. But such a claim "does not by itself provide a basis for relief."  *Id*. at 315.  A petitioner cannot state a claim for a "fundamental miscarriage of justice" without a procedural default that otherwise prevents the Court from reviewing any of Petitioner's constitutional claims here. *See id*.; *see also Beason v. Samuel*, 2025 WL 905524, at *21 (S.D. Cal. 2025) (finding habeas petitioner who raised a general "fundamental miscarriage of justice" claim failed to state a cognizable claim on federal habeas).  There has been no such default in Martin's case and as such, the narrow exception set forth in *Schlup* is inapplicable.

Therefore, after an independent review of the record, the Court finds the state court's denial of the Martin's "fundamental miscarriage of justice" claim was not objectively unreasonable.  *See* 28 U.S.C. § 2254(d)(1).  Nor was the denial based on an unreasonable determination of the facts in light of the evidence presented during state court proceedings. *See* 28 U.S.C. § 2254(d)(2).  Martin is not entitled to habeas relief as to claim one.

**B.    Ineffective Assistance of Counsel**

In his second ground for relief, Martin argues he received ineffective assistance of counsel, in violation of his Sixth Amendment rights. [ECF No. 1 at 24–31.]

### *1.    State Court Decision*

Petitioner raised this claim in a petition for habeas corpus filed with the California Supreme Court.  [ECF No. 32-21 at 37–51.]  The court denied the petition without comment or citation.  [ECF No. 32-22.]  This Court therefore looks through to the last reasoned state court decision to address the claim which, in this case, is that of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805–06.  In denying the claim, the appellate court stated:

[Martin] contends his counsel failed to conduct a proper investigation and obtain records to establish a defense that Martin's victims all fabricated their claims that their sexual contact with Martin was nonconsensual. Martin offers no evidence to suggest that if his counsel had conducted such an investigation, he would have discovered any exculpatory evidence. Instead, Martin states that he recently hired a private investigator "to dig up the dirt." He further states that his private investigator is "currently investigating this case and pursuing the evidence."

To establish ineffective assistance of counsel, Martin must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.) In the context of a claim of ineffective assistance of counsel challenging the failure to investigate, a petitioner "must establish the nature and relevance of the evidence that counsel failed to present or discover." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Here, Martin offers nothing more than speculation that if his counsel had performed a more thorough investigation, there is a possibility that he may have discovered exculpatory evidence. Martin appears to acknowledge that he does not have any actual evidence and that his attempt to find this evidence, through the services of a private investigator, is ongoing. However, without any indication that any such evidence actually exists, Martin cannot establish that he was prejudiced by any alleged deficient performance by his counsel.

[ECF No. 32-20 at 1–2.]

### 2.     Clearly Established Law

The Supreme Court established the legal standard for an ineffective assistance of counsel claim in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, to establish ineffective assistance of counsel, a petitioner must demonstrate that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense.  *Id*. at 687–88.  Both prongs of the *Strickland* test must be satisfied to establish a constitutional violation and as such, the failure to satisfy either prong requires the denial of an ineffective assistance claim.  *See id*. at 687.

*Strickland's* first prong requires a petitioner to establish that defense counsel's performance was deficient by showing that, in light of all of the circumstances, counsel's

performance was "outside the wide range of professionally competent assistance." *Id.* at 690; *see also Richter*, 562 U.S. at 105 (stating that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom"). Judicial scrutiny of counsel's performance "must be highly deferential," and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Pinholster*, 563 U.S. at 189. "[F]ederal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (per curiam) (citation omitted). The burden to show deficient performance "rests squarely on the" petitioner, and "the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013).

The second prong of the *Strickland* test requires establishing prejudice by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. The court must consider the totality of the evidence before the jury in determining whether a petitioner satisfied this standard. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010).

### 3. Analysis

Martin alleges defense counsel was ineffective because he failed to properly investigate his case. [ECF No. 1 at 26.] Specifically, he alleges defense counsel failed to adequately investigate, interview and/or call witnesses; failed to investigate prior "false accusations made by witnesses; failed to obtain phone records; and failed to "expose" an immunity agreement provided to one of the witnesses. [*Id.* at 18–19, 26–30.] He further argues that the "cumulative effect" of these alleged deficiencies resulted in prejudice. [*Id.* at 31–32.]

a.    Failure to Investigate, Interview and/or Call Witnesses

The state court reasonably denied Petitioner's claims that counsel was ineffective in failing to locate, interview and/or call witnesses.  Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *See Strickland*, 466 U.S. at 691; *see also Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) ("[C]ounsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." (emphasis in original)).

First, Martin alleges defense counsel failed to locate and interview witnesses from the local church G.M. testified she went to shortly after she was assaulted by Petitioner. [*See* ECF No. 1 at 28.]  But Martin acknowledges that even law enforcement was also unable to locate any of the people G.M. spoke to at the church and as such, he has not shown counsel's failure to locate them was unreasonable.  *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) ("The duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed."). Moreover, even assuming these witnesses could have been found, Martin's self-serving speculation that, if interviewed, they might have given information helpful to his defense is not enough to establish prejudice under *Strickland*.  *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting an ineffective assistance of counsel claim based on trial counsel's failure to interview or call an alibi witness, when there was no evidence in the record that the witness would have testified favorably for the defense).

Second, Martin claims defense counsel failed to hire and call an "expert" to testify that the injuries sustained by Norma were minimal and inconsistent with her testimony that he beat her for "hours."  [ECF No. 1 at 29.]  But again, Petitioner's claim rests solely on his own speculation that an expert would have provided such testimony.  The state court's denial of this claim was therefore reasonable.  *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (finding speculation that an expert could be found and would testify at trial insufficient to establish prejudice under *Strickland*).

b.  Failure to Investigate Prior Accusations

Next, Martin argues defense counsel was ineffective for failing to investigate prior "accusations" purportedly made by the G.M. and Norma, which he contends were "false." [ECF No. 1 at 27–28.]

Petitioner, however, offers only conclusory allegations to support his claim. Mere speculation that further investigation might lead to evidence helpful to the petitioner is insufficient "to demonstrate ineffective assistance of counsel for failure to investigate." *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended by 253 F.3d 1150 (2001). First, as to G.M., Petitioner states she previously lied about an encounter with an individual named "Eddie," and another with "Michael and Gerardo." [ECF No. 1 at 28.] He cites to an "Exhibit 8," [*see* ECF No. 1 at 28], as support but there is no such exhibit attached to the Petition or Reply.[3] [*See generally*, ECF Nos. 1, 33.] Martin's cursory and vague claim of ineffective assistance is insufficient to establish a *Strickland* violation. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

And as for Norma, Petitioner claims defense counsel failed to investigate "prior false allegations" she made about her ex-husband abusing their children. [*See* ECF No. 1 at 29, ECF No. 33.] As support, however, Petitioner again provides only conclusory statements contained in his own self-serving declaration, which is insufficient to support his claim.[4] *See Dows*, 211 F.3d at 486–87 (finding *Strickland* claims based wholly on petitioner's self-serving affidavit about counsel's preparation and investigation presented no basis for

---

[3] This exhibit appears to be attached to Petitioner's state habeas petitions, [*see* ECF No. 32-21 at 522–24], but it does not support Petitioner's suggestion that G.M. was lying about either incident. According to the report, when an investigator asked G.M. if anything like the incident with Martin had happened to her before, G.M. responded that someone named "Eddie" had previously tried to force her to give him oral sex and she could not remember the incident with "Michael" and "Gerardo." *Id.* at 524. There is nothing in the report to show G.M. made "false" accusations.

[4] The declaration is not attached to Martin's federal petition but was included in exhibits to his state habeas petitions. [*See* ECF No. 32-19 at 58–59.]

federal habeas relief).  In sum, the state court's denial of Martin's claim as speculative and conclusory was based on a reasonable application of *Strickland*.

### c.  Failure to Subpoena Phone Records

Next, Martin alleges trial counsel failed to "subpoena [his] phone records" to show G.M. lied about calling Andy B. from Martin's house on the day she was assaulted.  [ECF No. 1 at 30.]  However, Martin's speculation that records would show that no call had been made from his landline to Andy B. on that day is insufficient to demonstrate prejudice.  *See Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000) (holding unsupported speculation and conclusory allegations regarding an attorney's substandard performance are not sufficient to show either deficient performance or prejudice ); *see also Villagran v. Fox*, 2019 WL 5978891, at *12 (C.D. Cal. 2019) (rejecting claim that counsel was ineffective for failing "to obtain relevant phone records" because any prejudice was too speculative).  Therefore, the state court's denial of the claim was not unreasonable.

### d.  Witnesses Immunity Agreement

Martin claims defense counsel failed to investigate the "grant of immunity" given to Norma "in exchange" for her testimony.  [ECF No. 1 at 19.]  He also asserts defense counsel failed to "expose" that Norma was "still involved in using and selling drugs."  [*Id.* at 20.]  But contrary to Martin's suggestion, defense counsel questioned Norma about the immunity arrangement during cross-examination.  [ECF No. 32-7 at 170.]  And Norma admitted the prosecutor had promised her that any testimony "related to drug activity" would not be used against her in a criminal case.  [*Id.* at 177.]  Norma also testified that despite a period of sobriety after the incident, she had relapsed about three months before her trial testimony.[5]  [*Id.* at 161–62.]  Therefore, defense counsel's performance was neither deficient nor prejudicial and, as such, the state court's denial of the claim was not unreasonable.

---

[5] Norma also acknowledged at the beginning of her testimony that she was currently in custody for a probation violation related to an assault conviction and as such, the jury was well aware she had a criminal history.  [ECF No. 32-7 at 127.]

e.    Cumulative Effect

Finally, Martin argues the cumulative effect of defense counsel's errors amounted to ineffective assistance of counsel. In some instances, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even if each error considered individually would not warrant relief. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (characterizing this principle as clearly established by the Supreme Court). The Ninth Circuit has applied this principle in the context of *Strickland* and has held that prejudice may result from the cumulative effect of multiple deficiencies by counsel. *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).

Here, as discussed above, all but one of Petitioner's ineffective assistance of counsel sub-claims are based upon conclusory and speculative allegations that are insufficient to show deficient performance. And as to the sub-claim based on Norma's immunity agreement, the Court has found that counsel's performance did not fall below an objective standard of reasonableness. Where there is no single instance of deficient performance, nothing can accumulate to the level of a constitutional violation. *See Lopez v. Allen*, 47 F.4th 1040, 1053 (9th Cir. 2022) ("Petitioner has failed to establish multiple errors of constitutional magnitude," and "there can be no accumulation of prejudice amounting to a denial of due process."); *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) ("There can be no cumulative error when a defendant fails to identify more than one error.").

### 4.    Conclusion

In sum, the state court's denial of Martin's ineffective assistance of counsel claims was neither contrary to, nor an unreasonable application of, clearly established federal law. *See Andrade*, 538 U.S. at 72; 28 U.S.C. §2254(d)(1). Additionally, Martin has failed to show the state court's decision was based on an unreasonable determination of the facts. *See Miller-El*, 537 U.S. at 340; 28 U.S.C. § 2254(d)(2).

## C.    Denial of Motion for Mistrial

In ground three, Martin alleges his right to due process was violated when the trial court denied his motion for a new trial based on improper witness testimony. [ECF No. 1

at 34–38.]

### 1. State Court Decision

Martin raised this claim before the California Supreme Court in his petition for review, [*see* ECF No. 32-15 at 9–11], and it was denied without comment or citation. [ECF No. 32-16.] This Court therefore looks through to the last reasoned state court decision. *See Ylst*, 501 U.S. at 805–06. Here, that is the opinion of the California Court of Appeal. In denying the claim, the appellate court stated:

#### A. Background

Martin moved in limine to "[e]xclude testimony from the witnesses ... regarding suspicion that [Martin] is known to have guns." (Italics omitted.) The impetus for the motion was that "[i]n one or more statements[,] witnesses indicate[d] that [Martin] is known to have guns." Martin argued the evidence should be excluded as unduly prejudicial. (Evid. Code, § 352.)

At the hearing on the motion, the prosecutor advised that although she did not expect any witnesses would testify that they knew Martin owned guns, such evidence would be relevant to establish a lack of the victims' consent. Defense counsel countered that none of the victims had thus far indicated they submitted to Martin because they believed he had guns; thus, the evidence would be "inconsistent with . . . multiple previous statements, and the only reason to proffer that evidence . . . would be to unfairly prejudice [Martin]."

The trial court granted the defense motion and "exclude[d] any testimony from any witness that [Martin] was a person known to have guns." The court also ordered counsel that "potential witnesses be likewise admonished not to make any reference to any knowledge that they might have had that [Martin] had guns and not to make any statements that suggest that during their testimony."

During direct examination of Norma, the prosecutor asked what was going through her mind when she saw Martin secure the bedroom door with the metal pole. Norma responded that she knew she "was in some . . . kind of trouble" because there were too many locks and Martin's "attitude was getting a little different." When the prosecutor asked how Martin's attitude was changing, Norma explained that Martin "started showing [her] weapons that he had stored in his closet. . .. [T]here was a taser, some knives, *a gun* or something." (Italics added.) Defense counsel immediately requested a sidebar

conference, which the court granted.

During the sidebar, defense counsel reminded the court that it had granted the in limine "motion dealing with weapons and not having witnesses bring them up" and "instruct[ing] the prosecutor to admonish the witnesses not to bring it up."

The prosecutor acknowledged she had not admonished Norma regarding the in limine order, but explained that the testimony about the gun was unexpected because it was the first time Norma had mentioned one. Further, the prosecutor noted she had not had a chance to meet with Norma because Norma had recently been arrested for a probation violation, was in custody, and arrived late to the trial. Finally, the prosecutor argued that Norma's testimony was probative and did not violate the in limine order because the court prohibited testimony that Martin was known to have guns, not that he actually displayed one immediately before committing a charged offense. The prosecutor suggested Norma's testimony was "subject to cross-examination because it's the first time we are hearing that" Martin displayed a gun, and subject to cross-examination of police witnesses to establish that their search of Martin's apartment pursuant to a warrant did not yield any weapons. The prosecutor assured the court she would move on to a new line of questioning.

When the court asked defense counsel what remedy he sought, counsel requested a mistrial. The court denied the request, explaining "that's an extraordinary remedy." In the alternative, counsel asked that the offending testimony "be stricken and that the jurors be . . . directed to disregard the information."

Back in open court, the trial court instructed the jury as follows: "Ladies and gentlemen, the last question and the last answer by the witness are to be disregarded. You are not supposed to consider that for any purpose during this trial. The motion to exclude is granted . . .."

Defense counsel later established through cross-examination of a police detective that a search of Martin's residence revealed no weapons.

After the close of evidence, the trial court instructed the jury, "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose." [Footnote 4: The Court had similarly instructed the jury at the start of trial: "During this trial, the attorneys might object to questions asked of a witness. I'll rule on those objections

18

according to the law. . . [I]f I order the testimony to be stricken, you are to disregard that testimony and not consider it for any purpose."]

### B.    Legal Principles

"'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . ..'" (*People v. Clark* (2011) 52 Cal.4th 856, 990 (*Clark*); see *People v. Montes* (2014) 58 Cal.4th 809, 888 ["A motion for '"mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction."'"]; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094 (*Dunn*).) "Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court." (*Dunn*, at p. 1094.) "We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard." (*Dunn*, *supra*, 205 Cal.App.4th at p. 1094; see *Clark*, *supra*, 52 Cal.4th at p. 990; *People v. Jenkins* (2000) 22 Cal.4th 900, 986 (*Jenkins*) ["'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'"].) "'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Dunn*, at p. 1094.)

### C.    Analysis

Although the prosecutor admittedly failed to comply with the trial court's in limine order that she admonish witnesses not to testify that Martin "was a person known to have guns," we conclude the trial court acted within the scope of its discretion in denying Martin's motion for a mistrial.

Martin acknowledges in his briefing that (1) "a curative instruction to disregard improper testimony ordinarily is sufficient to cure the prejudice of an improperly volunteered statement"; (2) "juries are presumed to follow a court's admonishment"; and (3) "the trial court struck the improperly volunteered testimony and admonished the jury." Martin maintains this is an extraordinary case to which these general principles do not apply. We disagree.

The extent of the violation of the in limine order was not extraordinary. As the Attorney General points out, Norma's testimony that Martin showed her

a gun did not, strictly speaking, violate the order excluding testimony that Martin was known to have guns. Her testimony conveyed her firsthand observations just before Martin committed a charged offense, whereas the in limine ruling addressed rumor and speculation. Thus, we are left with the prosecutor's concession that she committed an essentially technical violation of the order by failing to admonish Norma regarding the scope of the order. In this circumstance, the trial court reasonably concluded the violation could be cured by striking Norma's testimony that Martin showed her a gun, and by instructing the jury to disregard the stricken testimony.

Martin further maintains the prosecutor's violation of the in limine order was extraordinary because Norma's testimony was irrelevant. He argues "[n]one of the charged offenses were alleged to involve weapons and the People never advised the court or the defense that it intended to elicit evidence that a complainant's will was overcome by the use of a firearm." We disagree. Norma's testimony that Martin displayed a gun before she orally copulated him was highly relevant to the issue of consent. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 836 (*Daveggio and Michaud*) [evidence that police found a gun and crossbow in the defendants' van "was relevant to whether the sexual penetration of [the victim] was accomplished by force or fear"]; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 259 [the "defendant press[ing] what [the victim] thought was a gun up against her side . . . surely helped induce the fear needed to overcome [her] will."].)

Nor has Martin specifically contended or shown that the prosecutor's failure to disclose Norma's testimony—which the prosecutor, herself, stated was unexpected—undermined the testimony's relevance or violated any pretrial discovery or disclosure obligations.

Next, Martin suggests that evidence of gun-possession is uniquely inflammatory to juries and improperly suggests the possessor has a propensity "to brandish and use" them and is predisposed to violence. None of the authorities Martin cited support this assertion. (See *Jenkins*, *supra*, 22 Cal.4th at p. 1006 [involving cellmate's testimony that the defendant confessed to committing the charged offense]; *People v. Branch* (2001) 91 Cal.App.4th 274, 278 (*Branch*) [involving evidence of prior sexual molestation]; *People v. Sam* (1969) 71 Cal.2d 194, 204 [involving the defendant's propensity to kick people "with whom he disagrees"]; cf. *Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 836 [evidence of weapon-possession was not improper character evidence where the "'fact' of . . . possession was relevant to prove something beyond defendants' 'disposition to commit' misconduct"]; *People v. Powell*

(2018) 6 Cal.5th 136, 168 [evidence that the defendant possessed a gun shortly before the charged murder and had displayed it months earlier was relevant to the charged murder and "did not merely reflect general criminal propensity"].)

Finally, Martin argues that Norma's testimony about his gun-possession "had an incurable effect on [his] defense" by impeaching his testimony that all of the sexual encounters with the victims were consensual. But "[e]vidence is not [unduly] prejudicial . . . merely because it undermines the opponent's position or shores up that of the proponent." (*Branch*, *supra*, 91 Cal.App.4th at p. 286.) Indeed, the "'"'ability to do so is what makes evidence relevant.'"'" (*Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 824.) Moreover, the prosecutor suggested during the sidebar several ways the defense could impeach Norma's testimony (e.g., by cross-examining her about the fact she had never mentioned it before, and by establishing through police testimony that they found no weapons in Martin's apartment when they searched it).

In light of the nature of the prosecutor's violation of the in limine order, the court's striking of the offending testimony, and the court's repeated admonitions to the jury to disregard stricken testimony, the trial court did not abuse its discretion in denying Martin's motion for a mistrial.

[ECF No. 32-14 at 8–14.]

### 2.      *Federal Law and Analysis*

There is no clearly established constitutional right to move for a new trial, or to have such a motion granted. *Herrera v. Collins*, 506 U.S. 390, 407 (1993) ("The Constitution itself, of course, makes no mention of new trials."). Moreover, issues based purely on state law do not present a cognizable federal habeas claim. *Estelle v. McGuire*, 501 U.S. 62, 67–68 (1991). Thus, challenges to a state court's denial of a motion for a new trial are generally not cognizable on federal habeas. *See Borges v. Davey*, 656 F. App'x 303, 304 (9th Cir. 2016) (concluding petitioner's contention that trial court misapplied state law in denying his motion for new trial was not cognizable on federal habeas review); *Broadnax v. Beard*, 588 F. App'x 637, 637 (9th Cir. 2014) (finding petitioner's contention that trial court erred in refusing to order new trial based on new impeachment evidence did not state cognizable claim for federal habeas relief); *see also Howard v. Soto*, 2016 WL 1068357, at *13 (C.D. Cal. 2016) ("[A] claim that a state court denied a petitioner's state-court

motion for a new trial, without more, is not cognizable on federal habeas review."); *Renteria v. Montgomery*, 2020 WL 1426639 at *14 (C.D. Cal. 2020) ("The denial of a motion for a new trial generally does not state a cognizable claim for federal habeas relief.").

Here, Martin alleges the denial of his motion for a new trial violated his right to due process. But a petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see Darby v. Allison*, 2015 WL 2088935, at *5 (N.D. Cal. 2015) (concluding habeas petitioner's claim that his due process rights were violated by the denial of a new trial was not cognizable because it did not present a theory as to how it violated due process).

In addition, Martin has not shown that Norma's stricken testimony rendered his trial fundamentally unfair. *See Armstead v. Neven*, 460 F. App'x 728, 730 (9th Cir. 2011) ("The relevant inquiry is whether the decision of the trial court to deny the motion for a mistrial made the trial fundamentally unfair."). After Norma mentioned a gun in her testimony, the trial court took prompt corrective action by striking Norma's testimony regarding the gun and admonishing the jury to disregard it. [ECF No. 32-7 at 142.] Furthermore, before both opening and closing statements, the trial court instructed the jury to disregard any testimony that had been stricken from the record and that they "must not consider" stricken testimony "for any purpose." [*See* ECF No. 32-1 at 111, ECF No. 32-6 at 12, ECF No. 32-9 at 27.] The jury is presumed to have followed these instructions, *see Weeks v. Angelone*, 528 U.S. 25, 234 (2000), and Petitioner has not provided any "reason[s] to believe that the jury in this case was incapable of obeying the [trial court's] instructions" to rebut this presumption. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *see also Godwin v. Davey*, 2018 WL 985462, at *6 (S.D. Cal. 2018) (denying habeas relief to petitioner who claimed the state court "erred in denying a motion for mistrial on the ground that the stricken testimony could not be cured by proper instructions to the jury"). Thus, Norma's stricken testimony did not render Petitioner's trial fundamentally unfair.

Based on the above, the state court's denial of the claim was neither contrary to, nor

an unreasonable application of, clearly established federal law. *See Andrade*, 538 U.S. at 72; 28 U.S.C. §2254(d)(1). In addition, the state court's decision was not based on an unreasonable determination of the facts. *See Miller-El*, 537 U.S. at 340; 28 U.S.C. § 2254(d)(2).

## VII.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a). The district court may issue a certificate of appealability if the petitioner has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the Court finds Martin has failed to make "a substantial showing of the denial of a constitutional right," and reasonable jurists would not find debatable this Court's assessment of his claims. *See id.* Accordingly, a certificate of appealability is **DENIED**.

## VIII.  CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus and **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

Dated: May 23, 2025

_____
Hon. Cathy Ann Bencivengo
United States District Judge